# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

UNITED STATES OF AMERICA,     )
              Plaintiff,     )     Case No. 2:14-cr-00335-KJD-CWH
                      )     **ORDER**
vs.     )
                      )
CHRISTOPHER WALKER,     )
              Defendants.     )
_____)

      This matter is before the Court on Defendant Christopher Walker's ("Walker") motion to suppress based upon an illegal Terry stop (doc. # 31), filed May 5, 2015, the government's response (doc. # 32), filed May 19, 2015, and Walker's reply (doc. # 33), filed May 26, 2015.   The Court conducted evidentiary hearings on July 16, 2015 and August 6, 2015.

## FACTS AND PROCEDURAL HISTORY

      Lopaka Harris ("Harris"), a clerk at a Rebel gas station in Las Vegas, testified that on May 24, 2015, an individual later identified as Walker entered the store, walked around the store, and as he passed the clerk's counter, moved his backpack and pulled up his shirt to show a gun in a holster on his hip.  Harris informed Walker that the store had a "no firearms" policy.  Harris claims that he told Walker to leave three or four times, and Walker responded by "talking junk."  Harris testified that the manner in which Walker displayed the gun was not threatening, but he was nevertheless afraid and shocked because of the presence of the gun.  Harris subsequently dialed 911 and reported to police that there was a man in the store who was brandishing a gun and became verbal when asked to leave.

1    Metropolitan Police Officer Kaplan ("Officer Kaplan") was dispatched to the store.  As Kaplan

2    was on his way, the computer monitor in his patrol car displayed a written report from dispatch

3    indicating a "Male inside store with a 413 / not threatening people" and that "Male was walking

4    around pulling up his shirt to brandish his 413 / saying he has a CCW, BMA, 20s, 6'1", Med Bld, Blk

5    Hr, Blu Shirt, Blk Shorts, w/ a WFA, 20s, Gry Shirt, Blu Jns."  Government Exhibit A.  Moments later,

6    the report indicated that "Subj became verbal when asked to leave store due to brandishing 413."  *Id.*

7    Officer Kaplan testified that he arrived at the parking lot of the store, which was in his normal

8    patrol area, about three minutes after receiving the radio dispatch broadcast.  Because he has

9    investigated numerous crimes in the area, Officer Kaplan considers the location of the store to be in

10   a high crime area.

11   According to dispatch records, Officer Kaplan reported that he arrived at the store at 23:28:56

12   hours.  Government Exhibit A.  At about the same time,  radio dispatch broadcast that Walker "is

13   starting to scare people."  When Officer Kaplan arrived at the store parking lot, he observed a man who

14   matched the description given to him by dispatch, later identified as Walker, near a bus stop adjacent

15   to the store parking lot.  As Officer Kaplan approached Walker, he noticed that Walker had a holster

16   on his hip carrying an unconcealed pistol.  Officer Kaplan testified that, at the time, he believed that

17   he was investigating a possible assault with a deadly weapon because the store clerk was reportedly

18   afraid of Walker brandishing or threatening people with a firearm, and arguing with the clerk when

19   he was asked to leave.  Officer Kaplan testified that with "officer safety" in mind, as he had no partner

20   and considered the store to be in a high crime area, he detained and handcuffed Walker and seized

21   Walker's firearm.

22   According to Officer Kaplan, Walker identified himself as Victor Gerard and provided a date

23   of birth.  Walker had no written forms of identification, which was suspicious to Officer Kaplan.

24   Officer Kaplan testified that he believed Walker was being untruthful about his identity.  Within a

25   minute, Officer Kaplan contacted dispatch to inquire about whether the name Victor Gerard had

26   possible warrants, and he was advised that there were no pending warrants.  Metropolitan Police

27   Officer Gilbert ("Officer Gilbert") arrived on the scene about the same time as Officer Kaplan and

28   assumed custody of Walker while Officer Kaplan continued his investigation.

Officer Kaplan then entered the store and spoke with Harris.  Officer Kaplan testified that he thought Harris was distressed, felt threatened, and was afraid when Walker refused to leave the store. Within the next 20 to 30 minutes, after the store manager arrived to provide assistance, Officer Kaplan reviewed the store's surveillance video of Walker in the store.  The video did not reveal that Walker had brandished the weapon, threatened anyone, or concealed the weapon.  Officer Kaplan concluded that Walker had committed no crime. Harris told Officer Kaplan that he wanted Walker to be "trespassed" from the store so that Walker was not free to enter the store again.  Officer Kaplan agreed and left the store. Office Kaplan then proceeded to the parking lot to speak with Walker, who was near Officer Kaplan's patrol car in Officer Gilbert's custody, with the intention of issuing a "trespass warning."  Officer Kaplan testified that the trespass warning was not a criminal citation but rather a formal notice from Harris on behalf of the store that Walker could no longer return to the store.

When Officer Kaplan returned to the parking lot, he learned that Officer Gilbert had spoken with Walker's girlfriend, Mitzi Berry ("Berry"), who was also at the bus stop.  Berry reportedly had two bags in her possession, and gave Officer Gilbert consent to search the bags.  Officer Gilbert found marijuana and a glass pipe inside one of the bags.  Berry purportedly stated that the marijuana and pipe belonged to Walker.

Upon learning about the marijuana, Officer Kaplan testified that he changed the focus of his investigation of Walker.  Officer Kaplan read Walker his *Miranda* rights and spoke with Walker for about 10 to 15 minutes.  Walker admitted that the marijuana and pipe in the bag belonged to him and that he had been smoking marijuana twice a day for the last few years.  Walker was then arrested at 1155 hours for being a prohibited person in possession of a firearm (based on drug use), and in possession of marijuana and drug paraphernalia.  Walker was then transported to the Clark County Detention Center, where his true identity and status as a convicted felon were discovered.  Walker is charged with being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).

## ANALYSIS

Walker moves to suppress the firearm, and argues that because there was no report that a crime was committed, and the police found no crime was committed in the store, Walker's detention was

unlawful. The government responds that there was reasonable suspicion to justify Walker's detention, and absent reasonable suspicion, the discovery of the firearm was inevitable because it would have otherwise been lawfully obtained.

**A.** **Initial Encounter**

It is well established that police may stop a citizen at any time, request identification and other information, and even request permission to search so long as a reasonable innocent person in the citizen's position recognizes that he or she is free to leave or terminate the encounter. *See generally Terry v. Ohio*, 392 U.S. 1 (1968); *Florida v. Royer*, 460 U.S. 491 (1983); *Florida v. Rodriguez*, 469 U.S. 1 (1984). Police officers can approach individuals as to whom they have no reasonable suspicion and ask them potentially incriminating questions as "mere police questioning does not constitute a seizure." *Florida v. Bostick*, 501 U.S. 429, 437 (1991).

For Fourth Amendment purposes, a seizure occurs "when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *Terry*, 392 U.S. at 19, n.16. In *United States v. Mendenhall*, 446 U.S. 544 (1980), the U.S. Supreme Court developed the *Mendenhall* test for determining when a seizure occurs. "A person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Id*. at 554.

The Court finds that, under the *Mendenhall* test, Walker was seized for purposes of the Fourth Amendment when Officer Kaplan confronted Walker outside of the Rebel store in response to the 911 call, seized Walker's firearm, and placed Walker in handcuffs to conduct the investigation.[1]

**B.** **Investigatory Detention**

"The Fourth Amendment permits brief investigative stops... when a law enforcement officer has a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Navarette v. California*, 134 S.Ct. 1683, 1687 (2014). An investigatory detention under the Fourth Amendment must be supported by "reasonable suspicion" that criminal activity may be afoot. *See Terry v. Ohio*, 392 U.S. at 1; *United States v. Arvizu*, 534 U.S. 266, 273 (2002). In

---

[1] The Court notes that Walker offers no argument that the use of handcuffs converted the investigatory stop to an arrest. The Court also notes that handcuffing a suspect does not automatically convert an investigatory stop into an arrest that requires probable cause. *See Washington v. Lambert*, 98 F.3d 1181, 1186 (9th Cir. 1996).

4

assessing whether an officer has reasonable suspicion to conduct an investigatory detention, reviewing courts look at the "totality of the circumstances" of each case to see whether the detaining officer had a "particularized and objective basis" for suspecting legal wrongdoing. *Id.* "An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." *United States v. Cortez*, 449 U.S. 411, 417 (1981); *see also United States v. Sigmond-Ballesteros*, 285 F.3d 1117, 1121 (9th Cir. 2002) (citing *Arvizu*, 534 U.S. at 273).

A reviewing court's determination of "reasonable suspicion" is a process that "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *Arvizu*, 534 U.S. at 273 (citing *Cortez*, 449 U.S. at 418). The Fourth Amendment is satisfied if an officer's action is supported by reasonable suspicion that criminal activity may be afoot, and observation of factors that are, by themselves, consistent with innocence may still collectively amount to reasonable suspicion. *Id.* at 273-74. Reasonable suspicion is not a matter of hard certainties but of probabilities. *Cortez*, 449 U.S. at 417-18. The reasonable suspicion necessary to justify such a stop "is dependent upon both the content of information possessed by police and its degree of reliability." *Navarette,* 134 S.Ct. at 1687. The reasonable suspicion standard is less than a preponderance of the evidence. *United States v. Sokolow*, 490 U.S. 1, 7 (1989).

Here, the Court finds that Officer Kaplan was justified in detaining Walker pending further investigation. Officer Kaplan knew that a 911 emergency call reported a man with a gun at a convenience store in a high crime area at around midnight. The report sent to Officer Kaplan's vehicle indicated that a man was pulling up his shirt to brandish a firearm and "became verbal" when asked to leave the store. Upon arrival, Officer Kaplan found an individual matching the description of the suspect outside of the Rebel store carrying a firearm. Officer Kaplan testified that upon his arrival, he believed he was investigating a possible assault with a deadly weapon because Walker was reportedly brandishing a firearm, threatening people, and refusing requests to leave the store. Officer Kaplan's belief was reasonable under the circumstances.

Of course, there are legitimate and legal reasons for a person to carry a weapon into a store, concealed or not. *Terry* contemplates the resolution of such ambiguities during the stop. *See Adams*

5

1    *v. Williams*, 407 U.S. 143, 145-47 (1972).  In *Adams v. Williams*, the Supreme Court explained that:

2        The Fourth Amendment does not require a policeman who lacks the precise level of
3        information necessary for probable cause to simply shrug his shoulders and allow a
         crime to occur or a criminal to escape.  On the contrary, *Terry* recognizes that it may be
4        the essence of good police work to adopt an intermediate response.  A brief stop of a
         suspicious individual, in order to determine his identity or to maintain the status quo
5        momentarily while obtaining more information, may be most reasonable in light of the
         facts known to the officer at the time.

6    *Id*. at 145-47.

7        A valid stop can include the momentary restriction on a person's freedom of movement in order

8    to maintain the status quo while making an initial inquiry.  *See United States v. Patterson*, 648 F.2d

9    625, 633 (9th Cir. 1981).  Otherwise, an officer could not perform a preliminary investigation of an

10   alleged wrongdoing.  *See United States v. Thomas*, 863 F.2d 622, 628 (9th Cir. 1988).  In cases where

11   "the conduct justifying the stop was ambiguous and susceptible of an innocent explanation," *Terry*

12   recognizes that "officers could detain the individuals to resolve the ambiguity."  *Illinois v. Wardlow*,

13   528 U.S. 119, 125 (2000).  This was such a case.

14       At the hearing, a portion of the radio dispatch recording was heard that revealed those

15   communications Officer Kaplan received, including the radio dispatcher's statement that Walker was

16   "starting to scare people."  Walker argues that this information was not accurate and simply an

17   embellishment by the dispatcher.

18       Latoya Guidry ("Guidry"), a Metro employee who received the 911 call from Harris, explained

19   at the hearing that her job was to collect information from a 911 caller and type pertinent information

20   into the computer system.  The computer system then communicated the information to the radio

21   dispatcher and to the officer's patrol car.  Using that information, the radio dispatcher would make

22   radio calls to coordinate and monitor officers regarding the incident.  Guidry testified, however, that

23   she had no other communication with the radio dispatcher regarding her conversation with Harris.

24   Because the information did not come from Guidry, it appears that the radio dispatcher simply

25   surmised that Walker was "starting to scare people."

26       Assuming the dispatcher embellished as to whether people were afraid, Officer Kaplan was

27   nevertheless justified in beginning his investigation by seizing and disarming Walker.  Officer Kaplan

28   found Walker, who matched the physical description of the suspect, outside the store with a gun.  This

verified that there was some basis for the 911 call. Officer Kaplan knew that an emergency complaint had been made about a man in a store "brandishing" a gun.[2]  Initially, the computer report indicated that the brandishing was not done in a threatening way, but the report also indicated that the individual refused to leave when asked to do so. It is a misdemeanor under Nevada law to refuse to leave a building after being warned by the owner to do so. *See* NRS 207.200. It was also reasonable for Officer Kaplan to investigate whether the weapon had been used in an intimidating manner. The Court finds that Officer Kaplan's belief that "criminal activity was afoot," based upon Officer Kaplan's experience and specialized training, was therefore reasonable. *Terry*, 392 U.S. at 30. Accordingly, there was sufficient basis to detain Walker pending further investigation, even without the dispatcher's purported embellishment that Walker was scaring people.

## C.    Delay in Investigation

Walker next argues that the delay in conducting the investigation converted the *Terry* stop into a *de facto* arrest without probable cause. In assessing whether a detention is too long in duration to be justified as an investigative stop, the court examines whether police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant. *See United States v. Sharpe*, 470 U.S. 675, 686 (1985) (20 minutes stop not unreasonable).

According to records and Officer Kaplan's testimony, Walker was detained at about 11:30 p.m. and was arrested at about 11:55 p.m. *See* Government Exhibit 1. The investigation therefore took about 25 minutes. During this time, Officer Kaplan interviewed Harris and reviewed the surveillance video to determine whether any illegal conduct was recorded. The store manager needed to be summoned to allow Officer Kaplan to review the video, which undoubtedly caused delay. However, considering the import of the video and the seriousness of the potential offense of assault with a deadly weapon, it was reasonable for Officer Kaplan to review the video to determine whether it contained evidence of what had occurred at the store. The Court finds that Officer Kaplan diligently pursued his investigation to quickly dispel his suspicions, with the passage of 25 minutes not at all unreasonable.

---

[2] The Ninth Circuit has held that brandishing a weapon for purposes of 18 U.S.C. § 924(c)(1) requires the open display of the firearm, or knowledge of the firearm's presence by another in some manner, for the purpose of intimidation. *United States v. Beaudion*, 416 F.3d 965, 968 (9th Cir. 2005).

Therefore, the Court concludes that Walker's detention did not become a *de facto* arrest.

Meanwhile, after interviewing Harris and reviewing the surveillance video, Officer Kaplan decided he would resolve the matter with a trespass notice rather than arrest Walker and pursue criminal charges. But for Berry's statement to Officer Gilbert that the marijuana belonged to Walker, and Walker's own admission that the marijuana was his, the matter would have ended. As Officer Kaplan returned to where Walker was being held, however, Officer Kaplan learned that Walker was in possession of marijuana as well as a firearm. Officer Kaplan reasonably began an investigation into the new allegation related to Walker's possession of narcotics, which led to Walker's arrest. Walker offers no argument that his subsequent arrest, based upon his own statements, was not supported by probable cause.[3]

## RECOMMENDATION

Accordingly, **IT IS HEREBY RECOMMENDED** that Defendant Christopher Walker's motion to suppress based upon an illegal Terry stop (doc. # 31) be **denied**.

## NOTICE

This Report and Recommendation is submitted to the United States District Judge assigned to this case under 28 U.S.C. § 636(b)(1). A party who objects to this Report and Recommendation may file a written objection supported by points and authorities within fourteen days of being served with this Report and Recommendation. Local Rule IB 3-2(a). Failure to file a timely objection may waive the right to appeal the District Court's Order. *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991).

DATED: August 20, 2015

_____
**C.W. Hoffman, Jr.**
**United States Magistrate Judge**

---

[3] Because the Court finds that the investigatory detention was not unreasonable, the Court will not address the government's argument regarding inevitable discovery.